# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARC GRANO, as Wrongful Death
Personal representative of the Estate of
FRANCISCA MARMOLEJO, Deceased,

      Plaintiff,

vs.                                     No. 17 CV 11 JAP/LF

PINNACLE HEALTH FACILITIES XXXIII, LP
d/b/a SAGECREST NURSING AND REHABILITATION
CENTER, PREFERRED CARE, INC., PREFERRED CARE
PARTNERS MANAGEMENT GROUP LP, PCPMG, LLC, and
PINNACLE HEALTH FACILITIES GP V, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Marc Grano, personal representative of the Estate of Francisca Marmolejo (Plaintiff), brings this lawsuit against the operator of the Sagecrest Nursing and Rehabilitation Center (the Sagecrest Center) and other related entities.[1] Plaintiff alleges that Ms. Marmolejo suffered injuries from a fall at the Sagecrest Center and that those blunt hip trauma injuries led to her death on June 4, 2014. (FAC ¶ 12; Resp. Ex. A.) Defendant Preferred Care, Inc. (PCI) asks the Court to dismiss all claims against it under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.[2] Plaintiff responds that this Court has personal jurisdiction over PCI because PCI participated in the operation of the Sagecrest Center.[3] PCI replies that even though it is related

---

[1] FIRST AMENDED COMPLAINT FOR NURSING HOME NEGLIGENCE, WRONGFUL DEATH AND PUNITIVE DAMAGES (Doc. No. 23).
[2] MOTION TO DISMISS PREFERRED CARE, INC. FOR LACK OF PERSONAL JURISDICTION (Doc. No. 38) (Motion).
[3] PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT PREFERRED CARE, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION (Doc. No. 42) (Response).

by common ownership to the entity that operates the Sagecrest Center, Plaintiff has not met his burden to show that PCI has the requisite minimum contacts with New Mexico.[4] Because Plaintiff has presented sufficient prima facie evidence PCI has the required minimum contacts with the State of New Mexico, the Court will deny the Motion.

I.      BACKGROUND

On December 2, 2016, Plaintiff initiated this lawsuit against Defendant Pinnacle Health Facilities XXXIII, LP d/b/a Sagecrest Nursing and Rehabilitation Center in the Fourth Judicial District Court, San Miguel County, New Mexico.[5] Defendant Pinnacle Health Facilities XXXIII, LP removed the case to this Court under federal diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff added several related entities as Defendants. (FAC) Plaintiff and all of the named Defendants, except PCI, have agreed to arbitrate Plaintiff's claims.[6]

Defendant Pinnacle Health Facilities XXXIII, L.P. d/b/a Sagecrest Nursing and Rehabilitation Center (the Licensed Operator), a Texas limited partnership, is the certified provider under Medicare and Medicaid that is licensed to operate the Sagecrest Center. Thomas Scott (Scott) is the sole limited partner of the Licensed Operator. Defendant Pinnacle Health Facilities GP V, LLC (GP V) (the General Partner), a Texas limited liability company, is the general partner of the Licensed Operator. Scott is the sole owner or member of the General Partner. *See* JOINT RESPONSE REGARDING CITIZENSHIP FOR DIVERSITY (Doc. No. 36) (Joint Resp.) at ¶¶ 6-8. Robert Riek (Riek) is the managing non-member of the General Partner. (Reply at 6.)

---

[4] PCI also submitted a Reply brief. *See* REPLY IN SUPPORT OF MOTION TO DISMISS PREFERRED CARE, INC. FOR LACK OF PERSONAL JURISDICTION (Doc. No. 47) (Reply).
[5] *Grano v. Pinnacle Health Facilities XXXIII, LP d/b/a/ Sagecrest Nursing and Rehabilitation Center*, No. D-412-CV-2016-00573.
[6] *See* STIPULATED MOTION TO VACATE TRIAL SETTING AND CASE MANAGEMENT DEADLINES (Doc. No. 44).

Defendant Preferred Care Partners Management Group, L.P. (the Management Company), a Texas limited partnership, provides administrative services to the Licensed Operator. (Mot. Ex. A, Riek Aff. ¶ 6.) The Management Company is comprised of a general partner, Defendant PCPMG, LLC, a Texas limited liability company and four limited partners, Mindy Provence, Gary Anderson, Gene Lunceford, and Mike Tennyson, who are Texas residents. (Joint Resp. ¶¶ 3-5.) These individuals are also members of PCPMG, LLC.

Defendant PCI is a Delaware corporation with its principal place of business in Texas. (*Id.* ¶ 10.) Scott owns 100% of the stock in PCI. Riek is the Vice President and general counsel of PCI. (Mot. Ex. A, Riek Aff. ¶ 3.) Riek reports directly to Scott. (Resp. Ex. D, Riek Dep. 15:11–15.) Therefore, PCI is related to the Sagecrest Center through a common owner, Scott, who owns and/or controls PCI and the Licensed Operator. According to Riek, PCI provides "nominal" legal services to the Licensed Operator and does not participate in the day to day operation of the Sagecrest Center. PCI asks the Court to dismiss it from this lawsuit because it had no role in the alleged negligent treatment of Ms. Marmolejo at the Sagecrest Center.

## II. STANDARD OF REVIEW

### A. Burden of Proof

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden to prove jurisdiction. Fed. R. Civ. P. 12(b)(2); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). However, if a court considers a pretrial motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff must make only a prima facie showing of personal jurisdiction by demonstrating facts, with affidavits or other documentary evidence. *Id.* When evaluating the evidence, the court must resolve all factual disputes in favor of the plaintiff. *Id.*

B.      Choice of Law

In a diversity action, the court applies the law of the forum state to determine personal

jurisdiction. *Rambo v. American Southern Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir. 1988). New

Mexico has outlined a three-part test for personal jurisdiction over a nonresident defendant: (1)

the defendant's acts must be enumerated in the New Mexico long-arm statute; (2) the plaintiff's

cause of action must arise from the defendant's acts; and (3) the defendant's acts must establish

minimum contacts to satisfy constitutional due process concerns. *Santa Fe Techs., Inc. v. Argus*

*Networks, Inc.*, 2002-NMCA-030, ¶ 13, 131 N.M. 772, 42 P.3d 1221 (2001). The New Mexico

long-arm statute provides in relevant part:

> Any person, whether or not a citizen or resident of this state, who in person or
> through an agent does any of the acts enumerated . . . thereby submits himself or
> his personal representative to the jurisdiction of the courts of this state as to any
> cause of action arising from: . . . (1) the transaction of any business; [or] . . . (3)
> the commission of a tortious act within this state.

NMSA 1978 § 38-1-16 (A)(1), (3). However, New Mexico courts do not require a technical

determination that a defendant committed one of the enumerated acts. *Sproul v. Rob & Charlies,*

*Inc.*, 2013-NMCA-072, 304 P.3d 18, 22 (N.M. Ct. App. 2012) (citing *Zavala v. El Paso Cnty.*

*Hosp. Dist.,* 2007–NMCA–149, ¶ 10, 143 N.M. 36, 172 P.3d 173). Instead, New Mexico courts

"have construed the state long-arm statute as being coextensive with the requirements of due

process, [thus, the] analysis collapses into a single search for the outer limits of what due process

permits." *Id.* (quoting *F.D.I.C. v. Hiatt,* 117 N.M. 461, 463, 872 P.2d 879, 881 (1994) (internal

quotation marks and citation omitted)). Fundamentally, a plaintiff must show that a defendant

"purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate"

and, thereby, "invoke[ed] the benefits and protections of its laws." *Id.* (citing *Hanson v. Denckla,*

357 U.S. 235, 253(1958)).

C.      Requirements of Due Process: Minimum Contacts

Personal jurisdiction over a nonresident civil defendant depends on the nature and quality of the defendant's contacts with the forum. In that regard, personal jurisdiction has been described as being either "general" or "specific." *See Sproul*, 2013-NMCA-072, ¶ 17 (stating "for the state to assert personal jurisdiction over a defendant depends on whether the jurisdiction asserted is general (all-purpose) or specific (case-linked).").

1.      Specific Jurisdiction

Courts may exercise specific jurisdiction when the claims "deriv[e] from, or [are] connected with" the defendant's contacts. *Goodyear Dunlop Tires Operation, S.A. v. Brown,* 564 U.S. 915, 919 (2011) (internal quotation marks and citation omitted). Accordingly, "to assert specific jurisdiction over a nonresident defendant, the plaintiff's claim must 'lie in the wake' of the defendant's commercial activities in New Mexico." *Sproul,* 2013–NMCA–072, ¶ 17. In sum, a court may assert specific jurisdiction over a nonresident defendant "if the defendant has "purposefully directed his activities at residents of the forum," and if the plaintiff's injuries "arise out of" defendant's forum-related activities. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (citation omitted). In the tort context, a defendant has "purposefully directed" his activities at New Mexico or its residents when a defendant has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. *Dudnikov*, 514 F.3d at 1072 (quoting *Calder v. Jones,* 465 U.S. 783, 789–90 (1984)).

2.     General Jurisdiction

If a cause of action does not arise out of the defendant's forum-related activities, a court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415 (1984). *See also Rambo*, 839 F.2d at 1418 (courts recognize general jurisdiction when a suit does not arise from or relate to the defendant's contacts but is based on the defendant's presence or accumulated contacts with the forum). General jurisdiction exists when "a foreign corporation's continuous corporate operations within a state are so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Kim v. Czerny*, 16-CV-1362 MCA/LF, 2017 WL 3084466, at *6 (D.N.M. July 17, 2017) (citation omitted) (unreported). Because the Court can exercise specific personal jurisdiction over PCI, the Court will not address whether the requirements for general jurisdiction have been met in this case.

III.     DISCUSSION

Plaintiff contends that PCI provided important legal and regulatory compliance services to the Licensed Operator that affected the quality of care available at the Sagecrest Center. Specifically, Plaintiff alleges that PCI's legal control of the Licensed Operator led to "fail[ure] to provide sufficient numbers of staff to meet Francisca Marmolejo's fundamental care needs; fail[ure] to hire and train appropriate personnel to monitor, supervise, and/or treat Francisca Marmolejo; failure to provide a safe living environment for Francisca Marmolejo, failure to recognize significant environmental factors which posed a fall risk to Francisca Marmolejo and respond to the same, and fail[ure] to timely recognize significant changes in the condition of Francisca Marmolejo and respond to the same." (Resp. at 4, citing FIRST AMENDED COMPLAINT (Doc. No. 23) (FAC) ¶¶ 12, 25.) In essence, Plaintiff argues that PCI's activities

allowed the Sagecrest Center to operate without sufficient staff to meet the needs of residents; therefore, Ms. Marmolejo's injuries arose out of PCI's participation in the operation of the Sagecrest Center and, consequently, this Court can exercise specific personal jurisdiction over PCI in this case.

PCI argues that Plaintiff has failed to show that PCI's provision of nominal legal services to the Licensed Operator affected the care provided at the Sagecrest Center; therefore, Plaintiff's claim does not "arise out of" PCI's forum-related activities. Reik states that at the time Ms. Marmolejo resided at the Sagecrest Center, PCI did not actively participate in the daily operation of the Sagecrest Center. (Mot. Ex. A, Riek Aff. ¶ 13.) Riek claims that PCI did not directly supervise the staff at the Sagecrest Center and did not create or control the budgets, staffing levels, staff training, or policies and procedures at the Sagecrest Center. (*Id.* ¶¶ 26, 28.) Thus, PCI contends that this Court cannot exercise specific jurisdiction over it. (*Id.* ¶ 38.)

A.     Legal Services

PCI provides legal services to the Licensed Operator and 115 other nursing facilities in 12 states. (Mot. Ex. A Riek Aff. ¶¶ 33–34; Resp. Ex. D, Riek Dep. 70:20–22.)[7] Those services include reviewing contracts with third-party vendors and facilitating agreements with lenders to "ensure availability of sufficient financing and needed capitalizations for facility operations." (Mot. Ex. A, Riek Aff ¶ 36; Resp. Ex. D, Riek Dep. 53:1–3; 108:14–20.) In addition, PCI examines lease agreements for the Licensed Operator. (Resp. Ex. D, Riek Dep. 57:9–22.) When the Licensed Operator is sued, PCI hires, oversees, and compensates local New Mexico counsel, and PCI acts as a "clearinghouse" for the production of documents in litigation. (*Id.* ¶ 36.) PCI

---

[7] Riek testified in a case in the Second Judicial District Court, Bernalillo County, New Mexico. *See Guzman v. Pinnacle Health Facilities XXXIII, LP d/b/a Sagecrest Nursing & Rehabilitation, et al.*, No. D-202-CV-2014-04529 ORDER ON MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION (Sept. 1, 2016) (denying PCI's motion to dismiss for lack of personal jurisdiction) (Resp. Ex. B). The Court will take judicial notice of the testimony that is part of the record in this case.

hires, oversees, and compensates New Mexico counsel when needed for New Mexico regulatory or employment issues, which may include hiring and firing of employees. (*Id.* ¶ 36; Riek Dep. 51:5–12; 53:11–15; 111:20–23.) Riek could not remember whether he or any of his staff appeared in person in New Mexico courts in 2012.[8] (Resp. Ex. D, Riek Dep. 108:11–111:11.) In providing legal services, Mr. Riek and his staff communicate with the Sagecrest Center's staff in New Mexico through telephone, email, and FedEx mail delivery. (*Id.* 109: 11–15.)

B.     Medicare and Medicaid Compliance

Riek reviews and certifies annual reports that must be submitted to State Medicaid and Federal Medicare officials in order for the Sagecrest Center to receive reimbursements for costs. (Mot. Ex. A, Riek Aff. ¶ 36.) As described by one court,

> The Medicare Act, established pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.,* is a federal program designed to provide health insurance for aged and disabled persons. 42 U.S.C. §§ 1395c, 1395d. The Medicaid Act, established pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* is a joint program funded by both the federal and state governments designed to provide medical assistance to certain persons in need. The Medicaid Act is administered by the individual states participating in the program.
>
> Payment from the federal government (under Medicare) and/or the State (under Medicaid) is made directly to the nursing home for services furnished to eligible beneficiaries of both programs. However, in order to qualify to receive payments under either program, a nursing home must be periodically "certified" through on-site "surveys," as meeting the health and safety requirements specified in the relevant statutes and regulations. 42 U.S.C. §§ 1395i–3(a)(3), (b)-(d), (g) (Medicare); 42 U.S.C. §§ 1396r(a)(3), (b)-(d), (g) (Medicaid); 42 C.F.R. § 483.1 *et seq.* (identical certification requirements under both programs).

*Peak Med. Oklahoma No. 5, Inc. v. Sebelius*, 10-CV-597-TCK-PJC, 2010 WL 4637511, at *1 (N.D. Okla. Nov. 5, 2010) (unreported). To receive direct reimbursement, the Licensed Operator must also enter into a provider agreement with the federal government (under Medicare) and/or the State (under Medicaid). 42 U.S.C. § 1395cc(a) (Medicare); 42 U.S.C. § 1396a(a)(27)

---

[8] Since the *Guzman* case related to treatment given in 2012, Riek was asked about PCI's activities in that year.

(Medicaid). *Id.* at *2. Under the Medicare program, providers receive monthly reimbursements for covered services. *Sunshine Haven Nursing Operations, LLC v. U.S. Dept. of Health and Human Services,* 742 F.3d 1239, 1243 (10th Cir. 2014) (citing 42 U.S.C. §§ 1395 to 1395kkk–1). The Centers for Medicare and Medicaid Services (CMS) oversees nursing facilities to ensure compliance with Medicare's conditions of participation. *Id.* CMS may deny payment, impose fines, or terminate a facility's Medicare provider agreement if the facility is non-compliant with the conditions of participation. *Id.* at 1245.

The Licensed Operator, as a certified Medicare provider, receives regular reimbursements from CMS for costs incurred in caring for Medicare patients and for overhead expenses attributable to those patients. Each year, the Licensed Operator must submit a cost report to ensure that the monthly Medicare payments for the reported year were accurate. 42 U.S.C. § 1395g. "The reimbursement scheme is premised on the assumption that the providers will be advanced funds periodically to cover their estimated costs and that adjustments must be made later when analysis of their reports reveals the actual cost of covered services. Interim payments are subject to retroactive adjustment." *United States v. Gravette Manor Homes, Inc.*, 642 F.2d 231, 233 (8th Cir. 1981).

Although Medicaid was established by the federal government, Medicaid benefits are primarily administered by the Medical Assistance Division of the New Mexico Human Services Department (NMHSD). NMSA 1978 § 27-2-12.3. *See generally U.S. ex rel. Baker v. Cmty. Health Sys., Inc.,* CIV. 05-279 WJ/ACT, 2012 WL 7220646, at *1 (D.N.M. Mar. 30, 2012) ("Medicaid programs are administered by the States in accordance with Federal regulations, but they are jointly financed by the Federal and State governments."). Under the New Mexico Medicaid program, the Licensed Operator, as a Medicaid provider, is paid a pre-determined,

fixed amount for services to Medicaid patients called a per diem rate for each day that it provides

care to a Medicaid resident. The per diem rate is calculated every three years using the annual

cost reports. Those costs include labor, rent, equipment, food, supplies, administration, and

certain other expenses, labeled home office costs. *See generally* COST RELATED

REIMBURSEMENT OF NURSING FACILITIES, N.M. Admin. Code § 8.312.3 *et seq.* At the

end of each fiscal year the Licensed Operator must submit to the NMHSD a financial and

statistical report containing an itemized list of allowable costs. NMAC § 8.312.3.11C.

C. The *Balderas* Case

In *State of New Mexico ex rel. Hector Balderas v. Preferred Care, Inc. et al.,* D-101-CV-

2014-02535 (*Balderas* case),[9] the Attorney General of New Mexico, Hector Balderas, alleges

*inter alia* that for the past several years PCI and numerous related entities have committed

Medicaid fraud and unfair trade practices in the operation of eleven nursing homes in New

Mexico. Balderas also alleges that PCI and its related entities have violated state and federal

regulations in the operation of those nursing homes. Balderas describes empirical studies of staff-

to-resident ratios at the affiliated nursing homes and alleges that they are chronically

understaffed: "the needs of residents for Basic Care routinely overwhelmed the limited staff at

their facilities making it physically and mathematically impossible for the Defendant Nursing

Facilities to provide Basic Care that was promised, required, and paid for by the State and

consumers. The inability of the . . . staff to provide Basic Care – and the need to increase staffing

levels – were or should have been plainly evident to Defendants." *State ex rel. Balderas v.

Preferred Care, Inc. et al.,* Case No. 15 CV 396 MV/SMV FIRST AMENDED COMPLAINT

---

[9] On May 8, 2015, the Defendants, including PCI, removed the *Balderas* case to the United States District Court for
the District of New Mexico. United Stated District Judge Martha Vazquez remanded the case back to the First
Judicial District Court, Santa Fe County, New Mexico. *See generally,* DEFENDANT PREFERRED CARE
PARTNERS MANAGEMENT GROUP LP'S NOTICE OF REMOVAL (Doc. No. 1) Ex. A (FIRST AMENDED
COMPLAINT) (*Balderas* Complaint).

(Doc. No. 1-2) at 28, ¶ 67. Balderas describes the omissions of care at the Sagecrest Center: "significant percentages of Basic Care required by residents and claimed to have been provided to them were not provided." (*Id.* ¶ 118.) Balderas reports that during an annual licensure survey on June 13, 2014, which was days after Ms. Marmolejo's death, "state inspectors found multiple violations of regulations relating directly to understaffing and failures of Basic Care" at the Sagecrest Center. (*Id.* ¶ 130(a).) In sum, Balderas claims that PCI and its related entities operated eleven nursing homes in New Mexico in violation of federal Medicare and state Medicaid regulations. (*Id.* ¶¶ 156-173.)

D.      PCI's Relationship to the Sagecrest Center

Under CMS regulations, PCI is considered a "related party" to the Licensed Operator "by virtue of common ownership."[10] (Mot. Ex. A, Riek Aff. ¶ 32.) In April 2015, however, PCI was listed as having "operational/managerial control" over the Sagecrest Center on the Medicare.gov website. (Mot. Ex. E). Riek testified that the April 2015 information was incorrect and that he did not know where Medicare.gov received the incorrect information. (Reply Ex. D, Riek Dep. 41:17–42:3 (July 6, 2015)). Currently, Medicare.gov states that since August 1, 2011, the Management Company has had "operational/managerial control" over the Sagecrest Center. (Reply Ex. C.) PCI does not explain why the Licensed Operator is identified as the "Legal Business Name" of the Sagecrest Center but is not named as having operational/managerial control of the Sagecrest Center, as asserted by Riek in this case. (*Id.*) From this information and Riek's statements, it is unclear which entity, PCI, the Licensed Operator, or the Management Company has primary responsibility for operating the Sagecrest Center. The Court can reasonably infer, however, that each entity, PCI, the Licensed Operator, and the Management

---

[10] Scott is the common owner. Scott owns 100% of PCI, and Scott is the sole member of the Licensed Operator's General Partner; therefore, Scott essentially owns and controls the Licensed Operator.

Company provides separate but vital services that contributed to the operation of the Sagecrest Center.

Under the CMS regulations, the Licensed Operator is considered a "chain provider" because it belongs to a "group of two or more providers under common ownership or control."[11] (42 C.F.R. § 421.404, Mot. Ex. C.) PCI is considered a "chain home office" for 116[12] nursing facilities located in 12 states. (Mot. Ex. A, Riek Aff. ¶¶ 33–34; Resp. Ex. D, Riek Dep. 70:20–22.) Under CMS regulations, the Licensed Operator reports and allocates costs for the legal services provided to the Licensed Operator. "As is required for CMS purposes and in the manner CMS prescribes, PCI reports and allocates its overhead as home office costs on a per-bed basis for each of the facilities." (Mot. Ex. A, Riek Aff. ¶ 34.) Entities may not be reimbursed from CMS unless the reported costs are actually incurred or paid. *See U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1171 (10th Cir. 2007) (explaining reimbursement scheme for costs "incurred" from services provided by entities related to a hospital's parent company). Riek asserted that neither the Licensed Operator nor Medicare paid PCI for the allocated home office costs. (*Id.* ¶ 35; Reply Ex. D, Riek Dep. 58:8–12.) However, in the portion of his testimony in the record, Riek did not state how PCI is paid for the services it provides for

---

[11] Provider means a hospital, . . . a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare[.] 42 C.F.R. § 400.202.
[12] In his affidavit, Riek stated that PCI is a chain home office for 110 facilities, but stated that it is the home office for 116 in his deposition. (Resp. Ex. D, Riek Dep. 70:20–22.)

the Licensed Operator. (*See generally,* Mot. Ex. A, Riek Aff. ¶¶ 32–34.)[13] Riek testified that PCI

does not have a contract or agreement with any of the other Defendants, and PCI does not "keep

track" of the legal services it provides to the Licensed Operator, such as through the recording of

billable hours. (Resp. Ex. D, Riek Dep. 71:13–16; 82:21–24.)

> CMS regulations state,

> [C]osts applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

42 C.F.R. § 413.17. CMS prohibits providers from directly reimbursing the allowable costs of a

"chain home office:"

> The home office of a chain is not in itself certified by Medicare. Therefore, its costs may not be directly reimbursed by Medicare. The relationship of the home office to Medicare is that of a related organization to participating providers. Home offices usually furnish central management and administrative services, e.g., centralized accounting, purchasing, personnel services, management direction and control, and other services. To the extent that the home office furnishes services related to patient care to a provider, the reasonable costs of such services are included in the provider's cost report and are reimbursable as part of the provider's costs. If the home office of the chain provides no services related to patient care, neither the costs nor the equity capital of the home office may be recognized in determining the allowable costs of the providers in the chain.
> . . .

---

13 In his deposition, Riek explained that the cost report "is merely a statement of cost . . . what's allocated to the facility. . . . [n]ot representative of what goes to Preferred Care, Inc." (Reply Ex. D, Riek Dep. 58:13–18.) Riek further stated he did not know if the costs were actually paid. However, Riek testified regarding a Medicare cost report,

> Q.      Okay. Do you know where on this document you would look to see if it was paid?
> A.      I don't believe there's any place on this document that shows what costs were actually paid.
> Q.      Okay. Does Sagecrest Nursing and Rehab Center usually pay the amount it's due to its vendors?
> A.      I can only assume so.

(*Id.* 58:25–59:6.)

Home office costs directly related to those services performed for individual providers and which relate to patient care plus an appropriate share of indirect costs (e.g. overhead, rent for home office space, administrative salaries) are allowable to the extent they are reasonable. . . . [T]hose costs related to nonmedical enterprises are not considered allowable home office costs.

(Mot. Ex. B, Form CMS 287-05, §§ 3900, 3901.) When asked about cost reports submitted on behalf of the Sagecrest Center, Riek testified that he signed cost reports after reviewing them. (Resp. Ex. D, Riek Dep. 80:19–81:13; Resp. Exs. F, G, H, I, and J (cost reports)).[14] Individuals who sign cost reports are required to certify the accuracy of the report or risk criminal, civil or administrative penalties. (*Id.*)

In Riek's deposition in *Guzman*, he answered questions concerning several cost reports submitted for the Sagecrest Center. One of the cost reports Riek signed on behalf of the Sagecrest Center was a report of 2012 reimbursable costs. (*See* Response Ex. G (2012 Federal Report)). Riek testified that he signed the 2012 Federal Report as an officer of PCI. (*See* Resp. Ex. D, Riek Dep. 81:1–5.). In that report, home office costs were reported as reimbursable costs. (Resp. Ex. G.) Riek asserted, however, that "the home office has no legal basis. It—it's an administrative regulatory definition promulgated by CMS that anyone that is a related organization that provides administrative or managerial services may charge back their administrative costs." (Resp. Ex. D, Riek Dep. 81:8–13.) When asked to define home office costs, Mr. Riek testified that Sagecrest Center is allowed reimbursement for a certain amount attributable to the legal services and for part of PCI's office expenses. (*Id.* 81:14–82:1.) Riek was also questioned about cost reports he signed on behalf of the Sagecrest Center submitted to the State of New Mexico. (*See* Mot. Ex. F (2013 State Report)). Part B of the 2013 State Report

---

[14] The reports to State of New Mexico are entitled "Schedule A, State of New Mexico Nursing Facility Financial and Statistical Report." The reports to the federal government are referred to as "cost reports." 42 C.F.R. §413.20(b). For simplicity, the Court will refer to both types of reports as "cost reports."

requires a listing of "[c]osts incurred as a result of transactions with related organizations."[15] PCI

is listed as a "related organization," and PCI's Home Office Costs are reported.

        E.    *Guzman* Order

Plaintiff points to an order in *Guzman* in which the state court denied PCI's motion to

dismiss for lack of personal jurisdiction. *See* Resp. Ex. B (the *Guzman* Order). The court found

that PCI had the requisite contacts to satisfy personal jurisdiction under New Mexico law as the

"legal arm of the related nursing homes[.]" (*Guzman* Order at 6.) The court relied in part on the

April 2015 Medicare.gov information listing PCI as the entity with "operational/managerial

control" over the Sagecrest Center. (*Id.*) The court determined that even though Riek's affidavit

contradicted the Medicare.gov information, "Movant's denial, even if found to be factually

credible at trial, serves in this procedural context to raise a material fact question that the Court

must resolve against the Movant [and] . . . precludes dismissal of PCI." (*Id.*) The court also relied

on evidence that PCI received from the Licensed Operator payment for PCI's "home office"

costs that included the legal services PCI provided. (*Id.* at 5.) The court stated PCI's

"involvement in New Mexico further includes: initially reviewing requests for medical records

from New Mexico nursing homes, and reviewing and signing off on state and federal costs

reports on behalf of the nursing facilities, PCI also reviews lease agreements for the nursing

facilities, and has reviewed the lease agreement for at least one of the New Mexico facilities."

(*Id.* at 6.) Furthermore, the court relied on the allegation that PCI's "financial decisions and other

activities led to Pinnacle/Sagecrest lacking sufficient qualified staff to care for patients, which

allegedly led to the harm suffered by Mr. Guzman." (*Id.* at 8.) The court concluded that it had

both specific jurisdiction, through PCI's operational role, and general jurisdiction, through PCI's

---

[15] PCI explained that it did not engage in transactions, but that this part of the form required that a related party for whom an operator claims a portion of allocable costs is considered to have been in a "transaction" with the operator.

ongoing provision of legal services to several New Mexico facilities, which the court

characterized as "purposeful availment of the privilege of conducting business activities with

New Mexico." (*Id.*)[16]

       F.     Conclusion

      PCI's provision of legal services to the Licensed Operator and PCI's certification of

reports to federal and state government authorities are activities that were essential to the

operation of the Sagecrest Center. Since most patients at the Sagecrest Center are covered by

either Medicare or Medicaid (*See* Mot. Exs. E-J), PCI's legal services related to regulatory

compliance at both the federal and state levels, means that PCI provided more than "nominal"

legal services. Through the provision of regulatory compliance services, PCI played a vital role

in the operation and management of the Sagecrest Center. PCI's Vice President, Riek, signed

cost reports to both state and federal governments and, therefore, could reasonably foresee that

PCI could be haled in court in New Mexico based upon the certifications of those reports. At one

time, the Medicare.gov website reported that PCI had operational/managerial control of the

Sagecrest Center. Although PCI disputes this information and the website now lists the

Management Group as the operator or manager of the Sagecrest Center, the Court must accept

Plaintiff's evidentiary proffers as true to determine whether Plaintiff has presented prima facie

evidence of personal jurisdiction. "At this stage of the proceedings, it is not for the court to

resolve disputed facts. Rather, the court 'must accept the plaintiff's (properly documented)

evidentiary proffers as true for the purpose of determining the adequacy of the prima facie

---

[16] PCI included as Exhibit B to its Reply an order by Judge Sarah Singleton, district judge in the First Judicial
District Court, Santa Fe, New Mexico in *Addie v. Pinnacle Health Facilities XXXIII, LP d/b/a/ Sagecrest Nursing &
Rehabilitation,* No. D-101-CV-2015-00832. In the ORDER DENYING IN PART AND GRANTING IN PART
MOTION TO DISMISS PREFERRED CARE, INC., PCPMG, LLC AND PINNACLE HEALTH FACILITIES GP,
V, LLC FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 1-012(B)(2), Judge Singleton,
without discussion, granted PCI's motion to dismiss for lack of personal jurisdiction, "premised on Defendants'
representation to the Court that they have and will maintain appropriate insurance for this claim." (*Id.* at 2.)

jurisdictional showing.'" *Walker v. THI of New Mexico at Hobbs Center,* 801 F.Supp.2d 1128, 1139 (D.N.M. 2011). The Medicare.gov website, therefore, supports Plaintiff's assertion that PCI, at one time, held itself out as the operator or manager of the Sagecrest Center.

Plaintiff alleges that Ms. Marmolejo received inadequate care at the Sagecrest Center due to the lack of sufficient staff to properly supervise the residents of the Sagecrest Center. Other than general denials, PCI provides no evidence to counter that factual assertion. And the allegations by the Attorney General in *Balderas* case support Plaintiff's assertion that the Sagecrest Center may not have complied with regulatory requirements for staffing and care.[17] PCI performed services vital to the operation of ten nursing homes in New Mexico, including the Sagecrest Center. PCI's role in this structure was to provide essential legal and regulatory services, the most important of which was the review and execution of cost reports sent annually to governmental entities responsible for reimbursing each facility for covered costs. Therefore, PCI has sufficient minimum contacts with New Mexico that it "should reasonably anticipate being haled into court" to answer for the sufficiency of the care provided by the Sagecrest Center. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). *See also House v. 22 Texas Services, Inc.* 60 F.Supp.2d 602, 607–09 (S.D.Tex. 1999) (finding that Pennsylvania corporation that was general partner of the limited partnership that managed 49 nursing homes in Texas was subject to specific personal jurisdiction because corporation accepted responsibility for liabilities of the limited partnership despite having only a 1% ownership interest in the limited partnership).

---

[17] The Court may take judicial notice of the allegations in the *Balderas* case, even though the Court does not consider the alleged facts as proven. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (cited in *Rosiere v. United States*, 650 Fed. App'x 593, 595 (10th Cir. 2016)).

PCI cites several cases dismissing entities that were tangentially involved in nursing home operations, but those cases are distinguishable. In *Resource Healthcare of America, Inc., f/k/a RHA/Home Office, Inc. v. McKinney*, a Florida appellate court ruled that it had no personal jurisdiction over Resource Healthcare of America, Inc. (RHA), the sole member of an LLC that operated Glen Oaks Health Care (Glen Oaks). 940 So.2d 1139, 1142 (Fla. App. 2d Dist. 2006). The complaint alleged that RHA, "established, conducted, managed, operated, or maintained" Glen Oaks; and therefore, RHA owed a duty to exercise reasonable care in the operation of the nursing home. *Id.* at 1143. RHA's president submitted an affidavit stating that in addition to having no role in the management of the nursing home, RHA had "neither billed nor received money from or on behalf of residents at Glen Oaks Health Care[.]" *Id.* at 1142. The manager of the nursing home testified by deposition that she had never heard of RHA and was not aware RHA had any involvement in the operation of the nursing home. *Id.* at 1143. The appellate court concluded that "[o]wnership of a resident subsidiary corporation by an out-of-state parent corporation, without more, has been repeatedly deemed insufficient to meet the requirements of [the Florida long-arm statute]." *Id.* The court noted, "when a parent exercises sufficient control over a subsidiary that control establishes an agency and supports jurisdiction. In the present case, [plaintiff] did not present an agency theory[.]" *Id.* n. 1 (citations omitted). Unlike in *Resource Healthcare,* this Court has evidence that PCI was responsible for maintaining compliance with the regulations vital for the operation of the Sagecrest Center and its ability to receive Medicare and Medicaid reimbursements.

PCI cites another Florida case *Schwartzberg v. Knobloch* that involved a nursing home with a complex corporate ownership and management structure. 98 So.3d 173, 179 (Fla. App. 2d Dist. 2012) (describing the licensed operator's ownership structure as "a complex web of limited

liability companies, corporations, and trusts."). Noting that seventeen Florida nursing homes were operated by related entities, the court ruled that no personal jurisdiction existed over two individual New York residents and several New York trusts that owned indirect interests in the licensed operator. *Id.* at 177.[18] The court described three ways in which a plaintiff may establish personal jurisdiction over an "upstream, nonresident parent[:] (1) the plaintiff could show that the parent company independently satisfies the test for jurisdiction; (2) the plaintiff could present facts that justify piercing the corporate veil; or (3) the plaintiff could show that the parent exercised significant control over the subsidiary to render the subsidiary an agent or alter ego of the parent. *Id.* at 182. In the *Schwartzberg* case, the plaintiff "established only that the [defendants] ha[d] indirect ownership interests in the nursing home's operating and management companies." *Id.* In contrast, Plaintiff has presented evidence of a mutually advantageous relationship between PCI and the Licensed Operator in which PCI provides legal services and regulatory compliance that allows the Licensed Operator to receive reimbursement for allocated costs associated with those services.

The other cases cited by PCI are also distinguishable. *See, e.g., Walker v. THI of New Mexico at Hobbs Ctr.*, 801 F. Supp. 2d 1128, 1158–62 (D.N.M. 2011) (finding no personal jurisdiction over parent company that was sole shareholder of subsidiary operator of nursing home because parent company sponsored an employee benefit plan, which was indicative of a "general and typical relationship" between a parent and a subsidiary); *Drumm Corp. v. Wright*, 326 Ga. App. 41, 43, 755 S.E.2d 850, 852 (2014) (finding no personal jurisdiction over Delaware

---

[18] The *Schwartzberg* defendants submitted affidavits stating that they did not have any offices or employees in Florida and that they did not control, operate, manage, consult with, or supervise the licensed operator. *Id.* at 178. In response the plaintiff submitted an affidavit of a certified public accountant who reviewed public records, including the nursing home's application for licensure and Medicare cost reports. *Id.* at 179. On a Medicaid cost report, Mr. Schwartzberg is listed as a 45% owner of the licensed operator. However, another cost report stated that Mr. Stolzberg, was the sole member and manager of the operating company. *Id.* The court stated that this presented an unresolved contradiction. *Id.* The court noted that this complex ownership structure reflected a trend among nursing home operators to create "single purpose entities" to "minimize the various risks of their businesses." *Id.* at 180.

parent corporation that only held investment interests in healthcare companies); *Extendicare , Inc. v. Estate of McGillen*, 957 So.2d 58, 60–63 (Fla. App. 5th Dist. 2007) (dismissing Canadian parent of subsidiaries that had not operated nursing homes in Florida during the time decedent was a resident of the nursing home); *and Weisler v. Community Health Systems, Inc.* No. 12 CV 0079 MV/CG, 2012 WL 4498919, *1 (D.N.M. Sept. 27, 2012) (dismissing Delaware holding company with indirect ownership interest in hospital, noting that holding company had no employees and had no business ties to New Mexico and stating that there were "five separate entities in the ownership chain between" parent and hospital).

In addition to showing that PCI has sufficient New Mexico contacts, Plaintiff must demonstrate that the claims arise from PCI's contacts with New Mexico. Plaintiff asserts that PCI's activities essentially allowed the Licensed Operator to negligently operate the Sagecrest Center and receive reimbursed costs from both the Medicare and Medicaid programs. In *Alto Eldorado Partnership v. Amrep*, 2005-NMCA-131, 138 N.M. 607, 124 P.3d 585, the New Mexico Court of Appeals considered this factor and found personal jurisdiction over a non-resident parent corporation that operated and controlled the resident subsidiary to the detriment of the subsidiary. *Id.* at ¶ 36. Here, PCI approved cost reports and regulatory filings that allegedly allowed the Sagecrest Center to operate with insufficient staff to properly care for the residents. Plaintiff has made a prima facie showing that his cause of action lies in the wake of PCI's activities or services provided to the Sagecrest Center. *Id.* (stating that the plaintiff's claim lies in the wake of the parent corporation's control of its subsidiary). Therefore, the Court finds that Plaintiff has made an adequate showing that his claims arise out of PCI's involvement in the operation of the Sagecrest Center.

In addition to making a prima facie showing that PCI has minimum contacts with New Mexico, the Plaintiff must also establish that exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. This determination is made by balancing five factors: (1) the burden on the defendant, (2) New Mexico's interest, (3) the plaintiff's interest, (4) the interest in an efficient judicial system, and (5) the interest in promoting public policy. *OMI Holdings, Inc. v. Royal Ins. Co. of Can.,* 149 F.3d 1086, 1095–96 (10th Cir. 1998). Riek states that PCI's offices in Plano, Texas are about 650 miles from Albuquerque, New Mexico. (Mot. Ex. A, Riek Aff. ¶¶ 40–42.) PCI maintains that to defend this lawsuit in New Mexico, its representatives would have to travel for depositions and trial, which would subject PCI to substantial and unjustified costs and expense. Plaintiff counters that Plano, Texas is a short plane ride from Albuquerque, New Mexico. According to Plaintiff, representatives of PCI can travel to and from Albuquerque on the same day based on the available flights. The Supreme Court has noted that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Fabara v. GoFit, LLC*, 308 F.R.D. 380, 406–07 (D.N.M. 2015), *as amended* (Aug. 20, 2015) (quoting *Burger King Corp.*, 471 U.S. at 474 (internal quotation marks omitted)). In *Employers Mutual Casualty Co. v. Bartile Roofs, Inc.,* the Tenth Circuit concluded that this factor weighed "strongly in favor" of the plaintiff, because the burden was "relatively slight" for the defendant, a Utah resident, "to litigate in the adjacent state of Wyoming." 618 F.3d 1153, 1162 (10th Cir. 2010). Likewise, the burden is "relatively slight" for PCI, a Texas corporation to litigate "in the adjacent state" of New Mexico. *Id.* This factor does not weigh in PCI's favor.

Second, the Court considers New Mexico's interest in adjudicating this dispute. "States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.,* 514 F.3d 1054, 1062 (10th Cir. 2008). "The state's interest is also implicated where resolution of the dispute requires a general application of the forum state's laws." *OMI Holdings, Inc.*, 149 F.3d at 1096; *Fabara*, 308 F.R.D. at 407. As illustrated by the *Balderas* case, the State of New Mexico takes very seriously its duty to protect its most vulnerable residents, the elderly, by ensuring that nursing homes receiving government funds are properly and safely operated in accordance with both state and federal law. This factor weighs in Plaintiff's favor.

Third, the Court considers Plaintiff's interest in obtaining convenient and effective relief in the forum of choice. Plaintiff and the other Defendants have agreed to arbitrate this dispute. Defendants represent that PCI has not agreed to arbitration. *See* STIPULATED MOTION TO VACATE TRIAL SETTING AND CASE MANAGEMENT DEADLINES (Doc. No. 44). However, in their answers the other Defendants state that Plaintiff's claims are subject to a mandatory binding arbitration agreement; and thus, the claims must be resolved in that forum. *See* ANSWER (Doc. No. 25) (Licensed Operator's Answer), ANSWER (Doc. No. 29) (PCPMG, LLC's Answer), ANSWER (Doc. No. 30) (Management Group's Answer), ANSWER (Doc. No. 31) (General Partner's Answer). The Court assumes that after this ruling, PCI will recognize that Plaintiff's claims must be arbitrated and will join the arbitration proceeding. The Court finds that this factor is neutral.

Fourth, the Court inquires whether New Mexico is the most efficient place to litigate the dispute. The key to this inquiry is the location of witnesses. *OMI Holdings, Inc.*, 149 F.3d at 1097. The events leading to Ms. Marmolejo's injury occurred in New Mexico, and witnesses to staffing levels and the care Ms. Marmolejo received at the Sagecrest Center are located in New Mexico. Plaintiff is a resident of San Miguel County, New Mexico. This factor weighs in Plaintiff's favor.

Finally, the fifth factor involves the analysis of the interests of the several states, in addition to the forum state, in advancing fundamental substantive social policies. *OMI Holdings, Inc.*, 149 F.3d at 1097. This factor focuses on whether the exercise of personal jurisdiction by a New Mexico court affects the substantive social policy interests of other states. *Id.* Exercising personal jurisdiction in New Mexico would not affect policy interests of other states. Moreover, the states are equally interested in maintaining the integrity of the Medicare and Medicaid programs. This factor also weighs in Plaintiff's favor.

After weighing the burden on PCI against New Mexico's interest in adjudicating the dispute, Plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies, the Court concludes that New Mexico is a reasonable, if not the most reasonable forum for resolving the Plaintiffs claims.

IT IS ORDERED THAT the MOTION TO DISMISS PREFERRED CARE, INC.

FOR LACK OF PERSONAL JURISDICTION (Doc. No. 38) is denied.

_____

SENIOR UNITED STATES DISTRICT JUDGE